## ATLAS GLASS CO. v. SIMONDS MFG. CO. et al. '

### (Circuit Court of Appeals, Third Circuit. June 11, 1900.)

### No. 12.

1. PATENTS—TERM—LIMITATION BY FOREIGN PATENT.

To constitute a "foreign patent," within the meaning of Rev. St. § 4887, which will limit the term of a subsequent American patent, it is not essential that the foreign grant shall be the equivalent of a patent granted by the United States, either as to the length of term, or the breadth of the exclusive rights secured to the grantee; but it is sufficient if such exclusive privilege as amounts to a substantial monopoly is granted by sovereign authority for a definite term, in accordance with the law or practice of the country.

2. SAME—DANISH PATENTS.

Prior to the enactment of patent legislation in Denmark, in 1894, a monopoly in an invention, or "eneret," was secured through royal letters patent granted by grace of the king, through the ministry of the interior, on petition therefor; and such patent gave to the grantee a monopoly to "make and allow to make" the thing patented, for a stated term, on condition that he carried out his invention within a year, and continued to employ it. *Held*, that such a grant was a "foreign patent," within the meaning of Rev. St. § 4887, and its term limited that of a subsequent patent granted by the United States for the same invention.

3. SAME—EXPIRATION—MOLDS AND MACHINERY FOR MAKING GLASS BOTTLES.

The Windmill patent, No. 416,389, for a mold for glass bottles, etc., and the Rylands patent, No. 416,376, for machinery for the manufacture of glass bottles by the use of molds of the Windmill type, both expired by limitation in 1896, by reason of the expiration of Danish patents granted for the same inventions in 1889 for a term of seven years.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

Thomas W. Bakewell and W. L. Pierce, for appellant.
James I. Kay and James N. Cooke, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This suit was brought for the infringement of patents for mechanisms for pressing and blowing glassware. It was originally brought against the Simonds Manufacturing Company and Biddle Arthurs, president, and John J. Power, under the following patents: No. 416,389, to Windmill, December 3, 1889, for molds for glass bottles, etc.; No. 416,376, to Rylands, December 3, 1889, for machinery for manufacture of bottles; No. 531,609, to Blue, December 25, 1894, for molds for the manufacture of glassware; No. 567,071, to Blue, September 1, 1896, for machines for manufacturing glass bottles. During the taking of the opening testimony, complainant and appellant announced that he would not ask relief under either of the patents to C. E. Blue, Nos. 531,609 and 567,071, so that the suit is limited to the Windmill and the Rylands patents, of which complainant duly became assignee.

After the suit was begun, it became necessary to bring into the case, as defendants, the Swayzee Glass Company, of Indiana, and the S. M. Bassett Glass Company and the Gilchrist Jar Company, both of New Jersey, with whom the machines built by the Simonds Manufacturing Company had been in successful use for nearly a year. The usual defenses were set up in the answers, original and supplemental, and also the following special defenses: That the said letters patent No. 416,389, granted to said Dan Rylands, assignee of Richard Windmill, and the said letters patent No. 416,376, granted to Dan Rylands, expired by limitation, under the provisions of the Revised Statutes of the United States (section 4887), prior to the bringing of the suit, for the reason that the inventions described and covered thereby were fully described in Danish letters patent granted to said Dan Rylands (No. 1,858) on October 1, 1889, for "Maskiner til forming af Glasflasker ved presning og pusning," for the term of seven years, and No. 1,895, on November 1, 1889, for "Maskiner til Fabrikation af Flasker," for the term of seven years, both of which patents have expired by limitation. It is also asserted in said supplemental answer that the said Rylands and Windmill patents, the only patents in question in this suit, have expired by limitation under the provisions of the said section of the said statutes of the United States, by reason of the expiration of a Spanish patent granted to said Rylands April 5, 1889. The court below found that claims 3 to 7 of the Windmill patent were good, and that defendant's machine would have infringed the same, and also that claim 11 of the Rylands patent was good, and would have been infringed in the same way, but held that claim 1 of the Rylands patent was not infringed. The court, however, decided that both patents had lapsed in 1896, by reason of the expiration of two prior seven-year patents (enerets) granted in Denmark in 1889. In the view taken by this court of the ground upon which the bill was dismissed in the court below, it will be unnecessary to consider any of the assignments of error except the ones in which it is asserted that the court erred in holding that the Windmill and Ryland patents were in any wise affected by the Danish enerets to Rylands of October 1 and November 1, 1889.

Section 25 of the act of congress of July 8, 1870, as embodied in section 4887, Rev. St., is as follows:

"No person shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid, by reason of its having been first patented or caused to be patented in a foreign country, unless the same has been introduced into public use in the United States for more than two years prior to the application. But every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

The earliest legislation on the subject of foreign patents is found in section 8 of the act of 1836, where, for the first time, it was provided that nothing in the patent act then enacted should be—

"Construed to deprive an original and true inventor of the right to a patent for his invention, by reason of having previously taken out letters therefor in

a foreign country, the same having been published any time within six months next preceding the filing of his specifications and drawings."

By section 6 of the act of 1839 two other conditions were made, as follows:

"Provided that the same shall not have been introduced into public and common use in the United States, prior to the application for such patent; and provided, also, that in all cases, every such patent shall be limited to the term of fourteen years from the date or publication of such foreign letters patent."

This was the state of the law when the act of 1870 was passed, the twenty-fifth section of which became section 4887, Rev. St., as above quoted. It will be observed that this section, while it extended the right of a foreign inventor and patentee, as it existed under the acts of 1836 and 1839, in regard to the limitation by a two-years public use, on the other hand, changed, in the interest of the American public, the term for which such foreign patentee could obtain a patent in the United States from 14 years from the date of the foreign patent to a period to be measured by the shortest term of the foreign patents previously obtained. This limitation of the term of the monopoly of an American patent, where the patentee has previously obtained a foreign patent, is obviously in the interest of those from whom tribute is exacted by such monopoly; and this purpose to do justice to the American public, by giving them the same privilege as is accorded to the people of the foreign country in which the patent is first granted, challenges the consideration of the court. Certified and legalized copies of these two Danish patents or enerets were offered in evidence, and no objection can be raised to the sufficiency of the proof of their being what they purported to be. Translations of the patents were also offered, and appear in the record. The first one, granted October 1, 1889, is as follows:

"We, Christian the Ninth," etc., "make known that we. in accordance with the application and request for the same, most submissively made, along with the circumstances brought out on the occasion, most graciously have allowed and granted, and herewith allow and grant, that Dan Rylands. of Barnsley, in England, may, for a period of 7 years, to reckon from this day, have the exclusive right everywhere in Denmark. with exception of the Faroes, Iceland. and colonies, to make and allow to make machines for molding glass bottles by pressing and blowing, indicated by him in the description hereto appended, with two drawings belonging thereto, of which the counterpart is furnished to our minister of the interior on condition that he, within two years, to be reckoned from the date of this, our allowance, here in the kingdom, has brought the invention named to execution and later combines [continues?] with it. Meanwhile this exclusive right will be lost, in so far as it shall be proved that any one else previously here in the kingdom has made or allowed to be made machines of the properties in question. Forbidding all and every one to make hindrance against what has been prescribed.

"Given at Fredensborg, October 1st, 1889.          Christian, R.

"Allowance of exclusive right for Dan Rylands, of Barnsley, in England, for machines for molding glass bottles by pressing and blowing."

Then follows what corresponds to the specifications and claim of an American patent, under the heading, "Description of Improvements in Machines for Molding Glass Bottles by Both Pressing and Blowing." The other patent or eneret, granted November 1, 1889, is in the same form, and need not be reproduced.

There is no question as to the identity of the inventions for which these grants were made with those of the so-called Rylands and Windmill American patents, which are the patents in suit. Complainant's contention is that these enerets were merely exclusive manufacturing licenses, and not patents, within the meaning of section 4887, and that therefore they cannot limit the term for which the American patents were granted. The meaning of the words "patent" and "patented," as used in section 4887, is not difficult to ascertain. The word "patent," originally a qualifying adjective applied to the "open letters" by which a sovereign grants an estate or privilege, has come to mean, in connection with the so-called patent laws of the United States, as well as in common parlance, the exclusive privilege itself granted by the sovereign authority to an inventor with respect to his invention. What the nature and extent of the exclusive privilege thus granted by the constitution and laws of the United States may be depends upon the terms of the act of congress providing for and regulating the same; and, when this section 4887 speaks of an invention which has been previously patented in a foreign country, it obviously means an invention with respect to which the inventor has received from the sovereign authority of such foreign country such exclusive privilege as its laws provide for or sanction. It would be doing violence to both the language and the purpose of the act of congress in question if we were to so construe these words (as we have been asked to construe them) as that the exclusive privilege granted by the letters patent of the sovereign of a foreign country must be coextensive with the privilege which is granted under the laws of the United States for the time being. The true meaning and purpose of the act of congress, as expressed in the language used, are accomplished by applying the word "patented" to the having received the grant of an exclusive privilege from a foreign sovereign, if such privilege amounts to a substantial monopoly. The contention of appellant is that inasmuch as, under our present patent laws, the exclusive privilege granted to an inventor is to "make, use, and vend" his invention, the words "patented in a foreign country" can only refer to an exclusive privilege to this full extent, and are therefore not applicable to the privilege granted by the Danish patent or eneret, which is only "to make and allow to make" the thing invented. In our opinion, this contention is not tenable. The Danish word "eneret," according to the Danish expert and patent solicitor produced as a witness by complainant, means "monopoly." There can be no question that the exclusive privilege to make and permit others to make is a substantial monopoly, and within the meaning of the language employed in section 4887. The fact, even if it be a fact, that under the Danish law the exclusive right to make and allow others to make the patented article does not forbid the sale and use of such an article imported from another country, would not so qualify the substantial value and effect of the monopoly granted by the Danish sovereignty as to make inapplicable the statement in the words of our statute that such invention was patented in a foreign country. The patent laws of the different countries vary so much in the ex-

tent of the grant provided for, and the limitations placed upon it, that to sustain complainant's proposition would lead to holding that few, if any, of the foreign patents could be included in the terms of section 4887. The words "previously patented in a foreign country" must then be taken to mean "patented according to the laws and usages of such foreign country," provided a substantial monopoly is thereby granted. None of the cases cited by the complainant, all of which have been examined, sustain its contention in this respect. Even the recent case of Société Anonyme pour la Transmission de la Force par L'Electricité v. General Electric Co. (C. C.) 97 Fed. 604, so much relied upon by complainant, does not, on the precise point determined upon the facts of the case, justify such an interpretation of the meaning of the act in question. It is true, the learned judge in that case said, "A patent implies a grant from the sovereign power, securing to the inventor, for a limited time, the exclusive right to make, use, and vend the invention." If he meant by this that there could be no patent in a foreign country, within the meaning of section 4887, that was not covered by the precise language of this definition, we must hold, not only that the statement was obiter dictum, but inaccurate. We are inclined to think, however, that the learned judge, in using the words "make, use, and vend," had in mind merely the statutory terms of the grant contained in an American patent; which were sufficient for his then purpose, inasmuch as he decided that in the case before him the Swiss government had granted no patent at all, because the condition required by the Swiss law had not been complied with, and the instrument claimed to be a patent was merely a temporary protection, with a promise that a definitive patent would be granted when the condition prescribed was fulfilled. The conclusion arrived at by the court upon the facts stated was correct, and the reasoning of the court upon those facts was clear and convincing. The question now before this court was not raised in that case, and we do not understand that it was attempted to be decided.

That there was no patent law, in the sense of a legislative enactment, in Denmark, until 1894, does not affect the situation. Prior to the enactment of the law of that year, patents or enerets were granted and issued by the king, in exercise of the royal prerogative, and the term for which they were granted was determined according to what seemed the exigency of each case. Nevertheless such patents were issued by virtue of the recognized lawful authority vested in the reigning monarch, and were acts of sovereignty as completely as were legislative enactments. How the sovereign authority of a country shall speak in a given case depends upon the constitution and settled scheme of government of that country. In Great Britain, as probably in other monarchical countries, patents for inventions have always been the subject of royal grants. The Danish patent act of 1894 changed the method of procedure and of granting an eneret or patent, although under this act the extent of the monopoly is about the same as it was according to custom and usage under the royal grants.

In view of the very clear and convincing discussion of this question by the learned judge of the court below, which we here refer to and adopt, it is not necessary to further elaborate the reasons for the conclusion arrived at. The decree of the court below dismissing the complainant's bill is affirmed.