QUEEN & CO. v. R. FRIEDLANDER & CO. et al.

(Circuit Court, N. D. Illinois, E. D. January 16, 1907.)

No. 26,509.

PATENTS—VALIDITY AND INFRINGEMENT—VACUUM TUBES.

The Sayer patent, No. 594,036, for an improvement in vacuum or X-ray tubes, designed to automatically regulate the pressure therein (claim 1), which covers, "as a means for varying the pressure in a high-vacuum tube, a main circuit for operating the tube and a shunt-circuit for varying the pressure," is for a function only of well-known means, and is void. Claims 2 and 3 *held* not anticipated, valid, and infringed.

In Equity. On final hearing.

Henry Wallace Carter and E. Hayward Fairbanks, for complainant.

Newman, Northrup, Levinson & Becker, Offield, Towle & Linthicum, and Albert H. Graves, for defendants.

KOHLSAAT, Circuit Judge. This bill is filed to enjoin defendants from infringing patent No. 594,036, granted to H. L. Sayen, November 23, 1897, for an improvement in vacuum tubes. Claims 1, 2, and 3 are worded so broadly that they cover all the matters in dispute, so that the inquiry is practically limited to them. They read as follows, viz.:

"(1) As a means for varying the pressure in a high-vacuum tube, a main circuit for operating the tube and a shunt-circuit for varying the pressure.

"(2) In combination with a high-vacuum tube, a shunt-circuit in proximity thereto, means connected with the above, and set into operation by the current in the shunt-circuit to cause gas to enter said tube, and means for varying the pressure in the shunt-circuit.

"(3) The combination with a high-vacuum tube of a shunt-circuit arranged in proximity thereto, and means connected with the above, and set into operation by the current in the shunt-circuit to cause gas to enter said tube."

Defendants insist that these claims, and especially claim 1, are functional. In the specification and drawings complainant has described his device with reference to its application to Roentgen ray tubes as "a novel method of providing them with an automatic and rapid adjustment for the pressure of gas therein." Claim 1 covers in terms every use of a shunt-circuit for varying the pressure in a vacuum or X-ray tube. The claims make no reference to the drawings or specification. The device set out in these latter shows a separate vacuum tube through which the shunt-circuit takes its course, outside the main tube, and not in communication therewith. Generally speaking, the alleged infringing device differs from that of the complainant mainly in that its shunt-circuit operates within the main tube. Both devices are intended to reduce the vacuum of the tube

whenever it becomes so high as to cease to be a conductor for the electric current. The resistance of an absolute vacuum to an electric current is theoretically absolute. The shunt device is so adjusted that it comes into service automatically whenever the resistance in the main circuit in the tube becomes greater than that of the shunt-circuit. This resistance of the shunt-circuit is regulated in the patent in suit at will, by varying the sparking-gap between the leading in or out conductors of the two circuits. To reduce the vacuum of the main tube, it is required that gas or air be introduced. This has long been done by nonautomatic means, as by heating a bulb communicating with the vacuum tube and containing some gas-producing substance. In this method a lamp was used. It can also be done by any other process whereby occluded gases within the vacuum chamber can be freed. These methods, it is evident, must be imperfect, as not being adjustable or automatic. In the use of the X-ray it is of the highest importance that the vacuum be maintained at an even pressure, in order that the ray be steady. It is claimed for both of the patents in suit that they, and they alone, severally accomplish this end satisfactorily, and that they have gone into extensive commercial use. Defendants' patent was issued to T. Friedlander April 14, 1903. It is of the gist of complainant's demands that Sayen was the first to operate the gas-supplying device to an X-ray tube by the use of the current of a shunt-circuit as one of the elements of a gas-expelling medium. Inasmuch as a function cannot be patented, this claim, to be valid as an invention, must attach to the device for accomplishing that result. All the elements of the patent are old. The shunt-circuit, provided with means for varying the pressure therein, and the vacuum-tube are confessedly old. The spark-gap, which is the means employed by Sayen to vary the pressure in the shunt-circuit, has been in use, for one purpose or another, ever since Crooke's experiments in 1899, and before that time. Lenard's article published in The Electrician prior to the discovery of the X-ray, and in March 23, 1894, describes experiments conducted by him with reference to high-vacuum tubes, and uses the following language:

"To enable the observer to control this sparking-distance and vacuum at any time, the adjustable spark-gap B (fig. 1) is introduced as a shunt to the vacuum tube."

From the testimony introduced by complainant, and from the fact that Lenard uses the following language in the same article:

"The vacuum tube was permanently attached to the pump—a Geissler Mercury pump—for although the vacuum when not used remained unimpaired for weeks together, yet the pressure during the working always increased perceptibly, so that from time to time the pumping had to be renewed."

—and also from the fact that no adequate device for varying the vaccum is therein disclosed, I am of the opinion that the German word "controliren," which in the article referred to is translated as "control," should have been translated "test" or "prove," in order to comport in sense with the rest of the article. It may properly be so translated. Giving it that meaning, the article becomes consistent. The sparking-gap of which he speaks may possibly act as a measurable

protection to the tube, by providing a shunt-course for the current. No attempt is made to show how the shunt-circuit current can be used to lower the vacuum of the tube. As pointed out by Lenard, the degree of vacuum may be tested by an adjustment of the sparking-gap, since the degree of vacuum in vacuum tubes is "commonly expressed in inches of spark-gap in free air." There seems to be no justification of defendants' position that Lenard intended in any way to suggest the application of the shunt-circuit as a means for reducing the vacuum in a tube, although the diversion of the current into the shunt-circuit might have some tendency to do so. The article, however, shows that the use of the sparking-gap and shunt-circuit in connection with vacuum tubes was not new with complainant. Nor was it new to make use of the electric current to reduce the vacuum of a tube. Dorn, in his article of November 12, 1896, suggesting an arrangement for the Roentgen tube, refers to Lenard's use of the spark-gap in a parallel circuit, and says he uses it with success, and adds:

"When using the tube, I first set the in-parallel connected spark-gap to the desired length, and, while the inductor is working, carefully warm up the potash with a Bunsen burner, till no discharge takes place through the gap."

Dr. Walter quotes Dorn's use of the Bunsen burner, and says he has had much better results from using an electric current for warming the gas-giving substance, taking the current from a three-cell storage battery. It will readily be seen that neither of these devices constitutes means for automatic regulation of the vacuum, or for varying the pressure in the shunt-circuit. In an article contributed to the Electrical Review April 1, 1896, Tesla rather indefinitely describes a device for overcoming the tendency of a vacuum to increase with use, and says:

"A convenient way to prevent this I have found to be the following: The screen or aluminum plate, S (fig. 2), is placed directly upon the wrapping of the leading-in conductor, E, but some distance back from the end. The right distance can be only determined by experience. If it is properly chosen, then during the action of the bulb the wrapping gets warmer, and a small bright spark jumps from time to time from the wire, E, to the aluminum plate, S, through the wrapping, W. The passage of this spark causes gases to be formed, which slightly impair the vacuum, and in this manner, by a little skillful manipulation, the proper vacuum may be constantly maintained."

It is thus apparent that he had the idea of automatic adjustment of the variation by means of gases generated within the tube itself. There seems, however, to be grave doubt as to whether the device described would be operative, and the article itself is silent as to whether Tesla had ever undertaken to demonstrate its efficiency or practicability. The details attending the introduction of the leading-in conductor into the tube, together with its wrapping and the absence of any attempt to show whether the vacuum was varied, and, if so, to what degree, and how that variation could be regulated or estimated, would seem to be so meagerly stated as to fail to furnish to one skilled in the art that degree of information required to construct the device or trust the operation. Moreover, it does not in terms employ or suggest a shunt-circuit. The experts seem unable to determine what the result of the Tesla experiment does establish.

Complainant insists the spark is no more than one of the phenomena which always accompany the production of the X-ray, while defendants find a complete anticipation of defendants' device in that the spark is generated inside the tube. One thing seems clear, if there is a shunt-circuit, it must take its course away from the main circuit and return, all within the tube. The court cannot say what the effect of this device is in the absence of any reliable demonstration. Whether or not it affects the pressure or degree of vacuum in the tube does not satisfactorily appear. The explanations given by both parties to the suit seem to me purely conjectural. The little understood operations of the electric current cannot be reduced to formulæ by the dictum of a court, which must needs lag where experts run. Tesla himself says that "by a little skillful manipulation the proper vacuum may be constantly maintained." What that manipulation is, the article does not disclose. The various attempts at producing and demonstrating tubes claimed to be made in accordance with the various descriptions of the articles introduced in evidence from the pens of physicists and certain patents have not served to elucidate the ideas of the writers and patentees, so that the articles and patents referred to must stand for what they make plain, and no more. The court is unable to justify a finding that the Tesla article in any way anticipates the patent in suit. What has been said as to the uncertainty of the experiments with the Tesla tube may be said of the three terminal tubes. They are not in practical use, nor have they ever been as self-regulating tubes, except as defendant may have combined them with its shunt-device. It is claimed for them that by disconnecting the two anodes, which are normally connected, and attaching the positive end of the coil to one anode alone, the vacuum can be changed. This two-anode arrangement tends to prevent blackening of the bulb. It also tends to produce a slight steadying effect on the electrical discharge, and also, when connected alone, gives a ray of different penetrating power. These tubes are not advertised as being self-regulating, and it is fair to assume that what was mistaken for a lowering of the vacuum was merely a decrease in the penetrating power of the ray given off when the aluminum anode alone was connected in circuit. Moreover, defendants' device has the three terminals. It does not appear why any tube requires two regulating devices.

At the first hearing of this cause, defendants introduced certain foreign patents, which were set up in their answer, viz.: (1) The German patent to Stearn, numbered 98,102, applied for October 13, 1896, and published or "ausgegeben" July 8, 1898; (2) Siemens & Halske German patent, No. 91,028, applied for March 24, 1896, and bearing no "ausgegeben" or publication date, but actually published March 13, 1897; (3) Swiss patent to Zehnder, applied for August 14, 1896, and published March 15, 1897; whereupon complainant was given time to proceed to Germany and Switzerland to obtain evidence as to the dates of publication thereof. This it did not do, but contented itself with taking proofs by way of records and other obtainable data. The order did not require complainant to go abroad, but only gave him the opportunity. The supplemental proofs adduced

are deemed sufficient to establish the dates of publication, and also the status of the Swiss patent to Zehnder. Under the patent laws of Germany, a patent when granted becomes operative from the day following the filing of the application. The publication or "ausgegeben" date is the date upon which the patent is actually issued. The dates above set out are admitted by defendants' answer. It thus appears that complainant filed his application prior (April 29, 1897) to the publication of the Stearns (July 8, 1898) patent. It satisfactorily appears from the record that Sayen was working upon his invention as early as 1896, and that he had completed the same as early as February 15, 1897—some 75 days before the patent was applied for. The testimony of Sayen upon this point is very full, and, practically, conclusively corroborated, so that the burden of proof required in such cases has been sustained beyond reasonable doubt. This being so, it follows that the dates of publication of the Siemens & Halske, and Zehnder patents are subsequent to the date of the invention of the patent in suit.

Section 4886 of the Revised Statutes [U. S. Comp. St. 1901, p. 3382] provides that:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, not known or used by others in this country, before the invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

In Elizabeth v. Pavement Co., 97 U. S. 130, 24 L. Ed. 1000, Justice Bradley says:

"A foreign patent, or other foreign printed publication describing an invention, is no defense to a suit upon a patent of the United States unless published anterior to the making of the invention or discovery secured by the latter, provided that the American patentee, at the time of making application for his patent, believed himself to be the first inventor or discoverer of the thing patented. He is obliged to make oath to such belief when he applied for his patent, and it will be presumed that such was his belief until the contrary is proven."

Sayen made such an affidavit. That not only he, but leading physicists of the country, so believed, is apparent from the congratulatory letters receive from Sir William Thompson (Lord Kelvin) and Dr. Roentgen, and also from the fact that Sayen was awarded the John Scott medal of the Franklin Institute after the investigation of a commission of well-known scientists, and also from scientific articles published at the time, all of which are shown in the record. It therefore appears that the Siemens & Halske and the Zehnder patents cannot avail as against the patent in suit. Furthermore, the Zehnder Swiss patent, as shown, is what is termed a "provisional" patent, and not entitled to the weight of a patent. Société Anonymé v. General Electric Co. (C. C.) 97 Fed. 604; Atlas Glass Company v. Simonds Mfg. Co., 102 Fed. 647, 42 C. C. A. 554. While Zehnder shows a main tube and an adjacent bulb in communication therewith for the

purpose of containing some gas-giving substance when subjected to heat, and says that heat may be applied by the use of electrodes, whereby an electric current can be made to pass through the bulb, yet he nowhere intimates that the current may be that of a shunt-circuit, or so arranged as to automatically adjust the vacuum in the main tube, by means of a sparking-gap or otherwise. The specification, like the drawings of this patent, are mere outlines, and fail to give one the impression that Zehnder had ever conceived the shunt-circuit automatic regulation of pressure in vacuum tubes. No reference is made in the claim to either the specification or drawings. It does not seem probable that he should have conceived the idea of automatic regulation without giving it unmistakable expression. It was too important an invention to be left to inference from general statements.

The Siemens & Halske German patent deals with Hitlorff tubes, which, it is explained, decrease in vacuum with use, being in that respect for some reason unlike ordinary Crookes tubes. It provides for the passage of the main current by a transfer of the in-conductor to the terminal, "in whose sphere of influence is a substance having great affinity to the elements of air, as phosphorous, arsenic, sulphur, iodine, etc., whereby a precipitation of gas or vapor is effected, according to Malignani's patent, causing a complete vacuum, it is claimed. The patentee adds:

"It may be mentioned that the tube can be kept rarified when, by using proper adjustable resistances, the cathode, K', were connected permanently in parallel to K, thus always absorbing the air."

The object of the patentees was to raise the vacuum in the tube by causing the cathode, K', which influences the air-absorbing substances above mentioned, to be connected to the K terminal, whereby heat will be generated, causing said substances to throw off a precipitation, which, it is claimed, will absorb the air and create a vacuum. The patentees also claim that by the insertion of a resistance in the K K' circuit, which is a shunt-circuit, a continual absorption of the air may be effected. This, if true, would seem to be automatic. It is difficult to understand how the effect of a continued current in a Hitlorff tube should be the reverse of that in an ordinary Crookes tube. This patent supplies no gas to the tube. It does not appear to have been subjected to any practical test, and should not be considered, even on its merits, an anticipation of Sayen's patent.

Stearn's German patent is for an incandescent lamp. It calls for a device where occluded gas is liberated from some suitable substance by means of a shunt-circuit, and permitted to pass into the vacuum. A resistance coil is placed in the shunt-circuit, and an unadjustable and very small spark-gap is located in contact with the gas-giving substance, evidently for the purpose of producing heat. It is provided that the resistance in the shunt-circuit shall exceed the resistance of the principal circuit as long as the vacuum in the latter is normal. Certainly, as a matter of public policy, whatever of doubt there may be as to anticipation should be resolved in favor of the American patent. The claims in suit may fairly be read upon this device if it is operative. It is, however, not apparent from the record that it has

ever been subjected to a practical test. Confusion has grown out of the indiscriminate use of the term "pressure." As used in claim 2, it undoubtedly refers to electrical pressure in the shunt-circuit, since no means is shown for varying the degree of vacuum therein. The variation of the electrical current in the shunt-circuit is one element of the means relied upon for varying the degree of vacuum in the main tube. This variation is secured through the electrical resistance supplied by the spark-gap. In claim 1 and in the specifications it refers uniformly to the degree of vacuum in the main tube. Sayen was the first to invent an automatic regulation of high-vacuum tubes by the use of a shunt-circuit. The claims in suit do not in terms call for an automatic regulation thereof, although claim 2 would seem to involve automatic regulation. Nor do they refer to the specification or drawings. But it is only from these that the court can ascertain what Sayen's invention is. It consists in supplying the shunt-circuit with a sparking-gap, apparently the most effective kind of a resistance, which would serve as a conductor for the current only when the vacuum in the tube through which the main current passed had become so intense as to practically present infinite resistance to that main circuit, and then providing automatic means for adapting that diverted current to the heating of some gas-producing substance, whereby occluded gas would be released and supplied to the over-attenuated vacuum of the tube in the main circuit. When the degree of vacuum is reduced sufficiently to permit the main current to resume its normal course through the tube, the resistance in the shunt-circuit operates to practically cut off the further flow of the current until such time as the vacuum in the tube should again become so over-attenuated as to suspend the flow of the main current through the tube, when the same process is repeated. In this manner, it will be seen, an automatic regulation of the high vacuum tube is secured. Claim 1 calls for a main circuit and a shunt-circuit as a means for varying the pressure in a high vacuum tube. The only advance on the prior art involved in the claim consists in the object sought to be attained. No device is suggested. It is simply an attempt to appropriate the main and shunt circuits to Sayen's sole use in varying pressure in vacuum tubes. All that he adds to the prior art is a function. Manifestly, he seeks to cover more than is suggested in his specifications or drawings. In the language of Carlton v. Bokee, 17 Wall. 463, 21 L. Ed. 517, he is making "ingenious attempts to expand a simple invention of a distinct device into an all-embracing claim, calculated by its wide generalizations and ambiguous language to discourage further invention in the same department of industry, and to cover antecedent inventions." This he cannot do. Claim 1 is therefore held void. Claim 2 shows the two circuits in connection with a high vacuum tube, augmented by means (a device) for causing gas to enter the tube, and means (a device) for varying the pressure in the shunt-circuit. Claim 3 is the same as claim 2, omitting the means for varying the pressure in the shunt-circuit. Taking these two claims into consideration, together with the specification and drawings, Sayen's invention must be limited to what may be called a device for automatically regulating high vacuum tubes.

by means of gas engendered by subjecting a gas-giving substance to the heat generated by a shunt-circuit current supplied with means for varying the pressure thereof. Defendants' device and patent can be read upon these two claims. The claims, if good, are not dependent upon minor details. They clearly include defendants' patent, and it must be held to infringe. Complainant is entitled to a permanent injunction, and it is so ordered.