### FARBENFABRIKEN OF ELBERFELD CO. v. KUEHMSTED.

(Circuit Court, N. D. Illinois, E. D.   August 11, 1909.)

No. 27,585.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ASPIRIN.

The Hoffman patent, No. 644,077, for acetyl salicylic acid, known medically as "asperin," is for the product of a new process which for the first time produced it in a pure state and rendered it valuable for medicinal use and is valid.  Also, *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity.  On final hearing.

Banning & Banning, Anthony Gref, and Livingston Gifford, for complainant.

John G. Elliott, for defendant.

SANBORN, District Judge.  Suit for infringement of the Hoffman patent, No. 644,077, issued February 22, 1900, the application having been filed August 1, 1898, for a medicinal body whose trade-name is "asperin," a product of coal tar, otherwise known as "acetyl salicylic acid."  The single claim is for an article of manufacture, and not for the method or process of making it.  In 1907 complainant's sales of asperin amounted to 2,000,000 ounces, and it is said that the market for the said infringing article is equally large.  The combined sales give it the largest market of any chemical preparation; quinine being next in amount of sales.

Acetyl salicylic acid was known as a chemical product for many years prior to the filing of this application; but it is alleged that it was never known in an unmixed or pure state until discovered by the patentee.

Salicylic acid is made from benzine, a coal-tar product, and is composed of carbon, oxygen, and hydrogen.  Acetyl salicylic acid is obtained by replacing an atom of the hydrogen with acetic acid.  Kraut, an eminent German chemist, produced it, but not in a pure state, by heating ten parts of salicylic acid with eight parts of acetyl chloride on a back-flow (reflux) cooler in a water bath, as long as hydrochloric

---

acid would escape, and then cooled it into a crystalline mass, which, he said, could be purified by recrystallizing out from boiling water. The claim of the patentee is that, instead of being purified or recrystallized by boiling water, the product is split by hot water into acetic acid and salicylic acid, and he substituted a waterless process by purifying with dry chloroform. In other words, it is claimed that the substance produced by Kraut, and otherwise found in the prior art, was impure, having a small percentage of free salicylic acid, and some other impurities. The free acid made it injurious to the stomach, and the boiling water split it up or destroyed it, instead of purifying it. The patentee purifies it by the use of dry chloroform, and thus obtains a pure article of acetyl salicylic acid.

In his specifications the patentee says:

"In the Annalen der Chemie und Pharmacie, vol. 150, pages 11 and 12, Kraut has described that he obtained by the action of acetyl chlorid on salicylic acid a body which he thought to be acetyl salicylic acid. I have now found that on heating salicylic acid with acetic anhydride a body is obtained the properties of which are perfectly different from those of the body described by Kraut. According to my researches the body obtained by means of my new process is undoubtedly the real acetyl salicylic acid

"Therefore the compound described by Kraut cannot be the real acetyl salicylic acid, but is another compound. In the following I point out specifically the principal differences between my new compound and the body described by Kraut:

"If the Kraut product is boiled even for a long while with water (according to Kraut's statement) acetic acid is not produced, while my new body, when boiled with water, is readily split up; acetic and salicylic acid being produced. The watery solution of the Kraut body shows the same behavior on the addition of a small quantity of ferric chlorid as a watery solution of salicylic acid when mixed with a small quantity of ferric chlorid; that is to say, it assumes a violet color. On the contrary, a watery solution of my new body when mixed with ferric chlorid does not assume a violet color. If a melted test portion of the Kraut body is allowed to cool, it begins to solidify (according to Kraut's statement) at from 118 degrees to 118.5 degrees centigrade, while a melted test portion of my product solidifies at about 70 degrees centigrade. The melting points of the two compounds cannot be compared, because Kraut does not give the melting point of his compound. It follows from these details that the two compounds are absolutely different.

"In producing my new compound, I can proceed as follows (without limiting myself to the particulars given): A mixture prepared from 50 parts of salicylic acid and 75 parts of acetic anhydride is heated for about 2 hours at about 150 degrees centigrade in a vessel provided with a reflux condenser. Thus a clear liquid is obtained, from which on cooling a crystalline mass is separated, which is the acetyl salicylic acid. It is freed from the acetic anhydride by pressing and then recrystallized from dry chloroform. The acid is thus obtained in the shape of glittering white needles melting at about 135 degrees centigrade, which are easily soluble in benzine, alcohol, glacial acetic acid, and chloroform, but difficultly soluble in cold water. It has the formula:

and exhibits therapeutical properties."

His claim is:

"As a new article of manufacture the acetyl salicylic acid having the formula:

being when crystallized from dry chloroform in the shape of white glittering needles, easily soluble in benzine, alcohol and glacial acetic acid, difficultly soluble in cold water, being split by hot water into acetic acid and salicylic acid, melting at about 135 degrees centigrade, substantially as hereinbefore described."

The question for decision is whether it required invention to discover the improved purifying process, whether the patentee obtained a new article of manufacture, or whether the prior art shows the same substance.

In the publications of the prior art there are no statements specifically referring to the decomposition of acetyl salicylic acid by hot water, to its not assuming a violet color when mixed with ferric chlorid, that it melts at 135 degrees centigrade, or that it could be purified by a waterless process. It is also admitted by defendant's experts that the Kraut product contained a small amount of free salicylic acid, and that the patent process is a waterless one.

The laboratory experiments of defendant's experts show that it is possible to purify the product by the use of hot water; but in making these experiments they hurried the process by not heating up the product, but putting it into water already boiling by cooling the solution then obtained in an ice box, and by pouring off the "mother solution" still containing more than half the product in order to rescue the product already crystallized, and prevent its contamination by further contact with the decomposition products present. They made in this manner three to five purifications in order to obtain the pure substance. They also hurried the dissolving stage by finely dividing the mass, and by stirring it in, and the cooling stage by using a small amount of the mass. The result was the loss of about one-half of the product. The experiments show that it is possible to secure purification by the hot-water process; but they also demonstrate its practical inefficiency. In these experiments use was also made of the patented process to the extent that, being warned by the patentee that the crystalline mass was split up by hot water, they took extraordinary precautions to prevent it; and they also employed Hoffman's test that his product gave no violet color with iron chlorid, in order to determine when their product had become pure. In other words, they added Hoffman's discoveries to those of the prior art in order to attempt to demonstrate that such art contains everything discovered by Hoffman. He protects the mass from water altogether, and they protect it as much as possible. The prior art suggests a water purification, and Hoffman a waterless one. It does not appear that it would be industrially possible to produce the product in the manner suggested by the experiments, although Prof. Haines is of opinion that it would be. Complainant's experts testify otherwise. A person skilled in the art,

with a practical end in view, would not proceed as do defendant's experts, but would use the waterless process, because it is easier, cheaper in loss of substance, and more efficient.

That the discovery of the patentee was a most valuable one clearly appears. Even a small amount of free salicylic acid injures the stomach; but, if this can be taken out, the acid is not dissolved in the stomach and does not injure it, but is held in bond intact until it reaches the lower digestive tract. While the discoveries of Von Gilm, Kraut, and others were known for many years before 1898, yet no extensive practical use was ever made of them, while the patented product went into immediate use and so continues on a large scale.

It is true that Kraut produced acetyl salicylic acid in an impure state, having the same formula as the Hoffman product; but it was comparatively useless. Hoffman discovered a method of taking out the impurities which made the product immediately successful to an extraordinary degree. This he did by his discovery of the waterless process of getting rid of the impurities. Unless the patent law is clearly unfavorable, his discovery should be protected. Kraut's product was not beneficially capable of performing the function of a patented article, while Hoffman was the first to make a successful one. He took a comparatively worthless substance and changed it into a valuable one. It was he, and not Kraut or the other famous chemists of the prior art, who gave to the world this valuable remedy.

That the law is with the complainant from the facts stated seems to me to be clear. Badische v. Kalle (C. C.) 94 Fed. 163, and s. c. 104 Fed. 802, 44 C. C. A. 201, is perhaps the closest authority in point. Other decisions sustaining the patentability of asperin are: Merrill v. Yeomans, 94 U. S. 568, 24 L. Ed. 235; Blumenthal v. Burrill, 53 Fed. 105, 3 C. C. A. 462, 11 U. S. App. 619; Badische v. Klipstein (C. C.) 125 Fed. 543; Mauer v. Dickerson, 113 Fed. 870, 51 C. C. A. 494; General Electric Co. v. Wise (C. C.) 119 Fed. 926; Kirchberger v. American Co., 128 Fed. 599, 64 C. C. A. 107; Naylor v. Aslop Co. (C. C. A.) 168 Fed. 911 (decided April, 1909); Consolidated Co. v. Crosby Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Seymour v. Osborn, 11 Wall. 516, 20 L. Ed. 33; Mahony v. Malcolm, 143 Fed. 124, 74 C. C. A. 318; Queen v. Friedlander (C. C.) 149 Fed. 771.

An English patent on the Hoffman invention was taken out by one Newton December 22, 1898. In 1905 an infringement suit was heard in the Chancery Division of the High Court of Justice before Mr. Justice Joyce, and resulted in the patent being declared void for anticipation. From the evidence in that case the court found that:

"The crystalline mass is substantially acetyl salicylic acid. Almost the whole of it is the compound acetyl salicylic acid completely formed. For practical purposes the whole may be taken to be and be used as acetyl salicylic acid. Its general and therapeutical characteristics are the same those of pure salicylic acid."

This finding is contrary to the evidence in this case, and is substantially contradicted by all of defendant's experts. Even if the proof in both cases were the same, the decision would not be a strong authority by reason of the differences in the patent systems of the two

countries. Siemen v. Sellers, 123 U. S. 276, 8 Sup. Ct. 117, 31 L. Ed. 153; McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

As to infringement, the substance sold by defendant answers to all the tests prescribed by the patent claim. Defendant testified that he sold it as the same chemical product as asperin and a substitute for asperin. The record shows sufficient prima facie evidence of infringement.

Complainant is entitled to a decree as prayed.